ENTER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

O

| | |
|---|---|
| TERRI L. COLLINS, ) | No. EDCV 05-0751-RC |
| Plaintiff, ) | |
| ) | OPINION AND ORDER |
| v. ) | |
| JO ANNE B. BARNHART, ) Commissioner of Social Security, ) | |
| Defendant. ) | |

Plaintiff Terri L. Collins filed a complaint on August 22, 2005, seeking review of the Commissioner's decision denying her application for disability benefits. The Commissioner answered the complaint on January 26, 2006, and the parties filed a joint stipulation on May 31, 2006.

**BACKGROUND**

**I**

On April 17, 2003 (protective filing date), plaintiff filed a claim for disability benefits under the Supplemental Security Income program of Title XVI of the Social Security Act ("the Act"), 42 U.S.C.

§ 1382(a), claiming an inability to work since April 11, 2003, due to fibromyalgia.[1]  Certified Administrative Record ("A.R.") 99-101, 109. The plaintiff's application was initially denied on November 6, 2003, and was denied again on March 4, 2004, following reconsideration. A.R. 51-62.  Plaintiff then requested an administrative hearing, which was held before Administrative Law Judge Joseph Schloss ("the ALJ") on April 4, 2005.  A.R. 19-48, 65.  On April 29, 2005, the ALJ issued a decision finding plaintiff is not disabled.  A.R. 11-17.  The plaintiff appealed that decision to the Appeals Council, which denied review on July 28, 2005.  A.R. 4-10.

## II

The plaintiff, who was born on May 9, 1967, is currently 39 years old.  A.R. 22, 99.  She has attended 2-3 years of college[2] and has

---

[1]  Fibromyalgia is a rheumatic disease that:

> causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. Common symptoms . . . include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease. Fibromyalgia's cause is unknown, there is no cure, and it is poorly-understood within much of the medical community.

Benecke v. Barnhart, 379 F.3d 587, 589-90 (9th Cir. 2004). "[F]ibromyalgia is diagnosed based on widespread pain with tenderness in at least eleven of eighteen sites known as trigger points." Brosnahan v. Barnhart, 336 F.3d 671, 672 n.1 (8th Cir. 2003); Rollins v. Massanari, 261 F.3d 853, 855 (9th Cir. 2001).

[2]  Although plaintiff initially indicated she completed two years of college, she testified at the administrative hearing that she had three years of college education. A.R. 24, 115. This discrepancy is not material.

2

previously worked as a bus driver, secretary, and hair braider.  A.R. 23-25, 110, 115, 118-24.

On March 29, 2000, plaintiff was examined in the emergency room at the Robert F. Kennedy Medical Center ("RFK"), where she was diagnosed with hypertension, dizziness, and elevated cardiac enzymes.  A.R. 205-07.  Later that day, Hazel McKillop, M.D., examined plaintiff and diagnosed her with orthostatic hypotension,[3] hypertension, and an abdominal hernia secondary to a cesarean section.  A.R. 200-01.  An electrocardiogram ("ECG") was borderline, A.R. 204, and repeat ECGs done on March 30 and March 31, 2000, were abnormal.  A.R. 195, 198.  An echocardiogram done March 31, 2000, was described as "technically limited" and it was not possible to rule out mild ventricular enlargement, though the test was otherwise normal.  A.R. 192-93.  On April 3, 2000, plaintiff underwent an exercise stress test, which was within normal limits and negative for exercise-induced myocardial ischemia,[4] but which revealed limited exercise tolerance.  A.R. 184-86.  On April 4, 2000, plaintiff underwent a nuclear medicine cardiac scan, which was negative.  A.R. 182.  Plaintiff was discharged from RFK on April 4, 2000, and ordered to rest at home for 2 more days before returning to work.  A.R. 179-81.  An ECG done May 4, 2000, was

---

[3] Orthostatic hypotension is "a fall in blood pressure associated with dizziness, blurred vision, and sometimes syncope, occurring upon standing or when standing motionless in a fixed position; it can be acquired or idiopathic, transient or chronic, and may occur alone or secondary to a disorder of the central nervous system. . . ."  Dorland's Illustrated Medical Dictionary at 867.

[4] Ischemia is a "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel."  Dorland's Illustrated Medical Dictionary at 920.

normal, A.R. 178; however, another ECG done June 1, 2000, was abnormal. A.R. 168-69.

On September 25, 2002, Manuel N. Baculi, M.D., reexamined plaintiff and referred her to a cardiologist, due to her continued complaints of chest pain. A.R. 163. Dr. Baculi reexamined plaintiff again on February 20, 2003, and diagnosed her with a history of headaches and chronic low back pain. A.R. 159.

On September 25, 2002, R. Prakash, M.D., a cardiologist, examined plaintiff and diagnosed her with hypertension, tiredness, sleep problems, and anemia, and prescribed medication and recommended a low fat diet and exercise. A.R. 160-61. Dr. Prakash also obtained a doppler echocardiogram, which was consistent with possible mitral valve prolapse,[5] but unremarkable for ischemic heart disease. A.R. 162.

On April 9, 2003, Rana A. Bahl, M.D., examined plaintiff and diagnosed her as having coronary artery disease, angina, hypertension, early congestive heart failure,[6] and arrhythmia. A.R. 305-06. A stress test revealed equivocal changes for ischemia with no evidence

---

[5] Mitral valve prolapse is "redundancy or hooding of mital valve leaflets so that they prolapse into the left atrium, often causing mitral regurgitation[.]" Dorland's Illustrated Medical Dictionary at 1466.

[6] Congestive heart failure is "a clinical syndrome due to heart disease, characterized by breathlessness and abnormal sodium and water retention, often resulting in edema. The congestion may occur in the lungs or peripheral circulation or both, depending on whether the heart failure is right-sided or general." Dorland's Illustrated Medical Dictionary at 567, 650.

4

of angina or arrhythmia, A.R. 304, 306, and an ECG was abnormal. A.R. 307. An echocardiogram performed April 18, 2003, revealed a left ventricular ejection fraction of 68%[7] and trace pulmonic regurgitation. A.R. 302. On December 23, 2003, and January 16, 2004, plaintiff had additional ECGs, both of which were abnormal. A.R. 298-301.

On April 11, 2003, plaintiff was admitted to Doctor's Hospital Medical Center of Montclair with complaints of recurrent atypical chest pain. A.R. 220-21. Chest x-rays taken April 11, 2003, showed no active cardiopulmonary disease, A.R. 223, and an ECG obtained April 13, 2003, also was normal. A.R. 222. Plaintiff was discharged from the hospital on April 15, 2003, with diagnoses of atypical chest pain, hypertension, which was controlled with medication, and stable degenerative joint disease. A.R. 210.

On April 16, 2003, Dee Beng Lim, M.D., examined plaintiff and diagnosed her with fibromyalgia, noting plaintiff has multiple tender points. A.R. 296. Dr. Lim treated plaintiff for fibromyalgia and also diagnosed her with chronic fatigue syndrome,[8] depression,

---

[7] Ejection fraction is "the proportion of the volume of blood in the ventricles at the end of diastole that is ejected during systole; it is the stroke volume divided by the end-diastolic volume, often expressed as a percentage. It is normally 65 $\pm$ 8 per cent; lower values indicate ventricular dysfunction." Dorland's Illustrated Medical Dictionary at 708.

[8] Chronic fatigue syndrome consists of "persistent debilitating fatigue of recent onset, with reduction of physical activity to less than half of usual, accompanied by some combination of muscle weakness, sore throat, mild fever, tender lymph nodes, headaches, and depression, with the symptoms not

insomnia, tension headaches, trapezius and lumbosacral myofascitis,[9] costochondritis,[10] hypertension, obesity, and angina, among other conditions. A.R. 277-95. On May 6, 2003, Dr. Lim opined plaintiff had been permanently disabled since 2002 due to fibromyalgia and chronic fatigue syndrome. A.R. 237. On June 19, 2003, Dr. Lim prescribed multiple trigger point injections to plaintiff. A.R. 291. On July 24, 2003, Dr. Lim opined plaintiff had fibromyalgia since 1994. A.R. 235-36. Dr. Lim found plaintiff has constant tenderness in her ankles and fingers, paravertebral muscle spasms, paresthesia[11] of her fingers and toes, is limited in her ability to reach, handle, and finger, has trouble walking, and needs an assistive device to walk longer than 10 minutes. Id.

On August 17, 2003, plaintiff was admitted to Pomona Valley Hospital Medical Center, where Dr. Lim examined plaintiff and diagnosed her with atypical chest pain, fibromyalgia, hypertension, and possible myocardial ischemia (not shown on the electrocardiogram). A.R. 248-49. ECGs performed August 17 and August 18, 2003, were

---

attributable to any other known causes." Dorland's Illustrated Medical Dictionary at 1752.

[9] Myofascitis is "inflammation of a muscle and its fascia, particularly of the fascial insertion of muscle to bone." Id. at 1170.

[10] Costochondritis means inflammation of the ribs and their cartilage. Id. at 412, 926.

[11] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication [a tactile hallucination in which there is a sensation of tiny insects crawling over the skin], often in the absence of external stimulus." Dorland's Illustrated Medical Dictionary at 701, 1324.

abnormal, A.R. 252-53; however, a chest CT scan and chest x-ray done on August 17, 2003, were normal. A.R. 250-51. On August 18, 2003, Dr. Bahl examined plaintiff and diagnosed her with coronary artery disease and unstable angina with hypertension. A.R. 245-47. On the same date, Dr. Bahl performed a cardiac catheterization and angiogram procedure on plaintiff, which was normal, A.R. 241-42, and plaintiff was discharged from the hospital. A.R. 243-44.

On September 10, 2003, H. Estrin, M.D., a nonexamining physician, opined plaintiff can occasionally lift and/or carry up to 20 pounds, climb, balance, stoop, kneel, crouch, and crawl; frequently lift and/or carry up to 10 pounds; and has a limited ability to push and/or pull with her arms and legs. A.R. 49, 260-67.

On April 24, 2004, Dr. Lim opined plaintiff has fibromyalgia that meets the American Rheumatological criteria for the disease, hypertension, gastroesophageal reflux disease, and anxiety, and her symptoms include chronic pain from head to toe, multiple tender points, nonrestorative sleep, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, frequent severe headaches, temporomandibular joint dysfunction, numbness and tingling, dysmenorrhea, anxiety, panic attacks, depression, mitral valve prolapse, and chronic fatigue syndrome. A.R. 310-14. Dr. Lim found plaintiff's pain is precipitated by changing weather, fatigue, movement/overuse, stress, cold, hormonal changes and being in a static position; her pain is frequently sufficiently severe to interfere with her attention and concentration; and she has a severe limitation in her ability to deal with work-related stress. A.R. 311-12. Dr. Lim

7

opined plaintiff can occasionally lift up to 10 pounds and bend and twist at the waist; can sit for 20 minutes at a time and for less than 2 hours in an 8-hour workday; can stand for 30 minutes at a time, walk for less than one block without resting or experiencing severe pain, can stand and/or walk for less than 2 hours in an 8-hour day, and must use a cane or other assistive device; and can use her arms to perform such activities as reaching, grasping, and fine manipulations for only 5% of the workday. A.R. 312-13. Dr. Lim also opined plaintiff needs to shift positions at will and must walk for 5 minutes every 20 minutes. Id. Furthermore, Dr. Lim opined plaintiff must lie down at unpredictable intervals during the work day and must elevate her legs at least 90 degrees with prolonged sitting 3-4 times a day. A.R. 313. Finally, Dr. Lim opined plaintiff's condition is likely to produce good and bad days, and she is likely to miss more than 3 days of work a month due to her condition. A.R. 314.

On June 17, 2005,[12] Dr. Lim noted he has treated plaintiff's fibromyalgia with "various trigger points at sub-occipital, cervical paraspinals, trapezius, levator scapulae, ilio-lumbars and sacro-iliacs, lateral epicondyles, sternal borders, iliac crests, [and] both knees[,]" and plaintiff also has hypertension, chronic fatigue syndrome, irritable bowel syndrome, and severe anxiety and depression.

---

[12] Dr. Lim's letter of June 17, 2005, was presented to the Appeals Council after the administrative hearing and made part of the record. A.R. 5, 8, 316. Since "the Appeals Council affirmed the decision of the ALJ denying benefits to [plaintiff, the additional] evidence is part of the record on review to this [C]ourt." Gomez v. Chater, 74 F.3d 967, 971 (9th Cir.), cert. denied, 519 U.S. 881 (1996); Bustamante v. Massanari, 262 F.3d 949, 952 (9th Cir. 2001).

8

A.R. 316. Dr. Lim further noted plaintiff has been treated with multiple trigger point injections and a course of physical therapy. Id. Further, Dr. Lim noted that plaintiff's pain level is always "10/10" and she requires morphine[13] for a few hours of pain relief, and plaintiff also takes numerous other medications, including Zelnorm,[14] Avinza,[15] Aciphex,[16] Baclofen,[17] Motrin,[18] Zestril,[19]

//

---

[13] Morphine "is used to relieve moderate to severe pain." The PDR Family Guide to Prescription Drugs, 425, 427-28 (8th ed. 2000).

[14] "Zelnorm . . . is indicated for the short-term treatment of women with irritable bowel syndrome . . . whose primary bowel syndrome is constipation." Physician's Desk Reference, 2304 (60th ed. 2006).

[15] "Avinza capsules are a modified-release formulation of morphine sulfate . . . indicated for the relief of moderate to severe pain requiring continuous, around-the-clock opioid therapy for an extended period of time." Id. at 1715.

[16] "Aciphex is indicated for the treatment of daytime and nighttime heartburn and other symptoms associated with [gastroesophageal reflux disease]." Id. at 1084.

[17] "Baclofen . . . is used to help relax certain muscles in [the] body. It relieves the spasms, cramping, and tightness of muscles caused by medical problems such as multiple sclerosis or certain injuries to the spine." Medline Plus, Drugs & Supplements, http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202080.html (last visited December 6, 2006).

[18] "Motrin is a nonsteroidal anti-inflammatory drug available in both prescription and nonprescription forms. Prescription Motrin is used in adults for . . . relief of mild to moderate pain." The PDR Family Guide to Prescription Drugs at 428.

[19] Zestril "is used in the treatment of high blood pressure. It is effective when used alone or when combined with other high blood pressure medications  It may also be used with other medications in the treatment of heart failure. . . ." Id. at 754.

Verapamil,[20] Ativan,[21] Klonopin,[22] Cymbalta,[23] and Vicodin ES.[24]  Id.  Dr. Lim opined plaintiff "is unable to do any kind of work because of her pain and fatigue.  She can not lift more than 10 [pounds], [she is] unable to sit for more than 15 minutes, [she] can not concentrate because of severe anxiety-depression [and s]he could definitely not perform her old profession of being a secretary or a hairdresser."  Id.  Finally, Dr. Lim stated he is trying to refer plaintiff to a rheumatologist and pain management specialist.  Id.[25]

---

[20]  "Verapamil is a type of medication called a calcium channel blocker.  It eases the heart's workload by slowing down the passage of nerve impulses through it, and hence the contractions of the heart muscle.  This improves blood flow through the heart and throughout the body, reduces blood pressure, corrects irregular heartbeat, and helps prevent angina pain.  [¶]  Some doctors also prescribe verapamil to prevent migraine headache and asthma and to treat manic depression and panic attacks."  Id. at 98, 721.

[21]  Ativan "is used in the treatment of anxiety disorders and for short-term . . . relief of the symptoms of anxiety."  Id. at 60.

[22]  "Klonopin is used alone or along with other medications to treat convulsive disorders such as epilepsy.  It is also prescribed for panic disorder – unexpected attacks of overwhelming panic accompanied by fear of recurrence."  Id. at 338.

[23]  "Cymbalta is indicated for the treatment of major depressive disorder."  Physician's Desk Reference at 1730.

[24]  "Vicodin ES tablets are indicated for the relief of moderate to moderately severe pain."  Id. at 531.

[25]  In the Court's opinion, such referral is necessary, if not vital, to assure proper medical treatment for plaintiff, see Benecke 379 F.3d at 594 n.4 ("Rheumatology is the relevant specialty for fibromyalgia.  Specialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community."), who currently is taking a cornucopia of prescription medications, some of which are quite powerful

10

1    Medical expert Joseph C. King, M.D., an internist, testified at
2 the administrative hearing that plaintiff has hypertension, which is
3 controlled, costochondritis, a history of fibromyalgia, and a history
4 of mild anemia, and that none of her conditions meets or equals any
5 listed impairment.  A.R. 44-45.  Dr. King opined plaintiff has "too
6 much medication in her system at one time and . . . apparently is
7 dependent on this medicine now. . . ."  A.R. 45.  With regard to
8 plaintiff's fibromyalgia, Dr. King opined plaintiff has "only 10
9 trigger points that I could find [though a]t one time she had 14
10 trigger points."  A.R. 44-45.  Dr. King also opined fibromyalgia
11 usually involves certain tender points and "doesn't involve the whole
12 body from the feet to the head[,]" and plaintiff has "too [many]
13 symptoms to go with the diagnosis of fibromyalgia."  A.R. 45.

**DISCUSSION**

**III**

The Court, pursuant to 42 U.S.C. § 405(g), may review the Commissioner's decision denying plaintiff disability benefits to determine if her findings are supported by substantial evidence and whether the Commissioner used the proper legal standards in reaching her decision.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006).

The claimant is "disabled" for the purpose of receiving benefits under the Act if she is unable to engage in any substantial gainful activity due to an impairment which has lasted, or is expected to last, for a continuous period of at least twelve months.  42 U.S.C. §

---

28   controlled substances.

11

1382c(a)(3)(A); 20 C.F.R. § 416.905(a). "The claimant bears the burden of establishing a prima facie case of disability." Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996); Smolen v. Chater, 80 F.3d 1273, 1289 (9th Cir. 1996).

The Commissioner promulgated regulations establishing a five-step sequential evaluation process for the ALJ to follow in a disability case. 20 C.F.R. § 416.920. In the **First Step**, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 416.920(b). If not, in the **Second Step**, the ALJ must determine whether the claimant has a severe impairment or combination of impairments significantly limiting her from performing basic work activities. 20 C.F.R. § 416.920(c). If so, in the **Third Step**, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. 20 C.F.R. § 416.920(d). If not, in the **Fourth Step**, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. 20 C.F.R. § 416.920(f). If not, in **Step Five**, the burden shifts to the Commissioner to show the claimant can perform other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.920(g).

Applying the five-step sequential evaluation process, the ALJ found plaintiff has not engaged in substantial gainful activity during the period at issue. (Step One). The ALJ then found that plaintiff has a history of fibromyalgia (Step Two); however, she does not have

an impairment or combination of impairments that meets or equals a listed impairment. (Step Three). The ALJ next determined plaintiff is able to perform her past relevant work as a secretary or hair braider; therefore, she is not disabled. (Step Four).

**IV**

A claimant's residual functional capacity ("RFC") is what she can still do despite her physical, mental, nonexertional, and other limitations. Mayes v. Massanari, 276 F.3d 453, 460 (9th Cir. 2001); Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). Here, the ALJ found:

> [plaintiff] retains the [RFC] to . . . lift, carry, push, and pull twenty pounds on an occasional basis and ten pounds on a frequent basis; . . . stand and walk for six hours in an eight[-hour] day; and . . . sit for six hours in an eight[-]hour day. However, the [plaintiff] is limited by her inability to do more than occasional climbing, balancing, stooping, kneeling, crouching or crawling.

A.R. 17. However, plaintiff contends the ALJ's RFC assessment is not supported by substantial evidence because the ALJ failed to properly develop the record, improperly rejected the opinions of her treating physician, Dr. Lim, and did not properly consider the side effects of her many medications.

"'In Social Security cases, the ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's

13

interests are considered.'" Smolen, 80 F.3d at 1288 (citation omitted); Widmark, 454 F.3d at 1068; see also Higbee v. Sullivan, 975 F.2d 558, 561 (9th Cir. 1992) (per curiam) ("We have long recognized that the ALJ is not a mere umpire at [an administrative hearing], but has an independent duty to fully develop the record. . . ."). This duty exists regardless of whether the plaintiff is represented by counsel. Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003); Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

The plaintiff contends the ALJ failed to properly develop the record regarding her ongoing medical treatment.[26] The plaintiff is correct, although not for the reason plaintiff proffers. In assessing plaintiff's RFC, the ALJ rejected the opinions of Dr. Lim, the **only** treating or examining physician to offer an assessment of plaintiff's physical limitations. A.R. 15. Instead, the ALJ relied on the opinion of a nonexamining physician, Dr. Estrin, but only "to the extent it [wa]s consistent with the functional assessment of the

---

[26] The plaintiff also contends the ALJ improperly rejected Dr. Lim's opinions. Although the Court finds it unnecessary to address this contention in full, plaintiff is correct. The ALJ, in his decision, relied on the testimony of the medical expert, Dr. King, specifically stating that "Dr. King, a medical expert, testified that the claimant only had ten tender points[,]" and "Dr. King testified that '[fibromyalgia] doesn't involve the whole body from the feet to the head'. . . ." A.R. 15-16 & n.2. However, the ALJ ignored a portion of Dr. King's testimony in which he noted that "[a]t one time [plaintiff] had 14 trigger points." A.R. 44-45. This error by the ALJ is significant because the American College of Rheumatology's 1990 Criteria for the Classification of Fibromyalgia requires pain on palpation of at least 11 of 18 tender point sites to support a fibromyalgia diagnosis. Rollins, 261 F.3d at 855; Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996); see also A.R. 316 (in which Dr. Lim identifies numerous trigger points on plaintiff's body).

[ALJ]."[27]  A.R. 15-16.  However, a nonexamining physician does not perform "a personal medical evaluation," and "[w]ithout a personal medical evaluation it is almost impossible to assess the residual functional capacity of any individual."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993); Mendoza v. Barnhart, 436 F. Supp. 2d 1110, 1116 (C.D. Cal. 2006); see also Nelson v. Heckler, 712 F.2d 346, 348 (8th Cir. 1983) (per curiam)("'[T]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at its best.'" (citation omitted)).  Since the ALJ made an RFC assessment **unsupported** by the opinion of any treating or examining physician, the ALJ did not fully and fairly develop the record.  See Pitzer v. Sullivan, 908 F.2d 502, 506 n.4 (9th Cir. 1990)(A "non-examining physician's conclusion, with nothing more, does not constitute substantial evidence, particularly in view of the conflicting observations, opinions, and conclusions" of a treating or examining physician).  Rather, the ALJ's RFC assessment is partially based on his own interpretation of the medical evidence, which is not proper.  Further, this error means there is no substantial evidence to support the ALJ's Step Four determination that plaintiff retains the RFC to perform her past relevant work.  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000); see also Shontos v. Barnhart, 328 F.3d 418,

---

[27] To the extent the ALJ's opinion is based on absolutely no medical evidence, it is improper.  See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998)(An "'ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . .'" (citations omitted)); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (same).  Rather, "the ALJ's RFC determination or finding must be supported by medical evidence, particularly the opinion of a treating or an examining physician."  Banks v. Barnhart, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006).

15

427 (8th Cir. 2003) ("Here, the ALJ improperly drew inferences from the medical reports, and relied on the opinions of nontreating, nonexamining medical consultants who relied on the records of the treating sources to form an opinion of [plaintiff's] RFC.  The opinions of . . . practitioners who have attempted to evaluate [plaintiff] without examination do not normally constitute substantial evidence on the record as a whole.  'Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.'"  (citations omitted)).

## V

When the Commissioner's decision is not supported by substantial evidence, the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  42 U.S.C. § 405(g); McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002).  "Generally when a court . . . reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'"  Benecke, 379 F.3d at 595 (citations omitted); Moisa v. Barnhart, 367 F.3d 882, 886 (9th Cir. 2004).  "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."  Benecke, 379 F.3d at 593.  Here, the opinions of a rheumatologist would be helpful, as would competent medical evidence supporting the ALJ's assessment of plaintiff's physical limitations; thus, remand is appropriate.  See Tonapetyan, 242 F.3d at 1150-51 (reversing and remanding ALJ's determination when ALJ failed to
//

1 properly develop record before concluding claimant did not have severe
2 mental impairment).[28]
3
4 **ORDER**
5     IT IS ORDERED that: (1) plaintiff's request for relief is
6 granted; and (2) the Commissioner's decision is reversed, and the
7 action is remanded to the Social Security Administration for further
8 proceedings consistent with this Opinion and Order, pursuant to
9 sentence four of 42 U.S.C. § 405(g), and Judgment shall be entered
10 accordingly.
11
12 DATE:  Dec. 7, 2006                     /s/ Rosalyn M. Chapman
                                                            ROSALYN M. CHAPMAN
13                                       UNITED STATES MAGISTRATE JUDGE

---

[28] Having so concluded, the Court declines to address the other arguments plaintiff raises, none of which would, under the circumstances presented, warrant granting plaintiff further relief than ordered.

R&R-MDO\05-0751.MDO
12/7/06

17